**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**GINA L. BIANCHI,**

                    **Plaintiff,**

       **v.**

**MICHAEL C. GREEN et al.,**

                  **Defendants.**

                      **1:18-cv-619**
                      **(GLS/DJS)**

_____

**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Bailey, Johnson PC          JOHN W. BAILEY, ESQ.
5 Pine West Plaza          CRYSTAL R. PECK, ESQ.
Suite 507
Washington Avenue Extension
Albany, NY 12205

**FOR THE DEFENDANTS:**
_Michael C. Green_
Woods Oviatt Gilman LLP    WILLIAM G. BAUER, ESQ.
700 Crossroads Building
2 State Street
Rochester, NY 14614

_Catherine Leahy Scott_
Hinckley, Allen Law Firm     LAUREL M. GILBERT, ESQ.
28 State Street
Boston, MA 02109

30 South Pearl Street, Suite 901  MICHAEL L. KOENIG, ESQ.
Albany, NY 12207           VICTORIA P. LANE, ESQ.

_Karen Davis_
Bond, Schoeneck & King, PLLC  ROBERT F. MANFREDO, ESQ.

22 Corporate Woods Blvd., Suite 501    MARA DEW AFZALI, ESQ.
Albany, NY 12211

*John Czajka*
Nixon, Peabody Law Firm               TINA E. SCIOCCHETTI, ESQ.
677 Broadway, 10th Floor              ANDREW C. ROSE, ESQ.
Albany, NY 12207

1300 Clinton Square                   JEFFREY LEAGUE, ESQ.
Rochester, NY 14604                   TODD R. SHINAMAN, ESQ.

*John Doe #1-4; Jane Roe #1-4*
                                      NO APPEARANCE

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Gina L. Bianchi brings this action against defendants Michael

C. Green, John Czajka, Catherine Leahy Scott, Karen Davis, and various

Doe and Roe defendants (hereinafter "Does")[1] for various 42 U.S.C. § 1983

and state law claims. (Am. Compl., Dkt. No. 58, Attach. 3 at 1-2.[2]) The

_____

[1] Specifically, John Doe #1-4 and Jane Roe #1-4. (Compl., Dkt. No. 1 at 1; Dkt. No. 58, Attach. 3 at 1.)

[2] In response to defendants' motions to dismiss, Bianchi filed cross-motions to amend her complaint. (Dkt. Nos. 58-61 (cross-motions to amend); Dkt. No. 58, Attach. 3 (proposed amended complaint).) Defendants only oppose the cross-motion to amend on the grounds that it would be futile, contending that the arguments in their motions to dismiss

2

action arises from alleged unlawful retaliation against Bianchi for her

testimony to the Office of the New York State Inspector General (OIG)

regarding an investigation into systemic sexual harassment, age

discrimination, racism, and workplace violence.  (*Id.*)  Pending are the

motions to dismiss of Green, (Dkt. No. 36), Davis, (Dkt. No. 28), Czajka,

(Dkt. No. 32), and Leahy Scott, (Dkt. No. 30).  For the following reasons,

the motions of Green, Davis, and Czajka are granted in part and denied in

part, and Leahy Scott's motion is granted.

## II. Background

A.    Facts[3]

Bianchi has been employed by New York State for twenty-seven

---

merit dismissal of Bianchi's proposed amended complaint as well.  (Dkt.
No. 71 at 1, 2; Dkt. No. 72 at 14-16; Dkt. No. 73 at 2, 3-4; Dkt. No. 74 at
13-16.)  Thus, in the interests of judicial economy, the court grants
Bianchi's cross-motion to amend and considers defendants' motions
against Bianchi's proposed amended complaint.  *See Pertillar v. AAA W. &
Cent. N.Y.*, 5:16-cv-238, 2018 WL 583115, at *1 n.1 (N.D.N.Y. Jan. 26,
2018); *Stanley v. OptumInsight, Inc.*, No. 1:13–CV–944, 2014 WL 906145,
at *1 (N.D.N.Y. Mar. 7, 2014).  Even so, Bianchi's proposed amended
complaint is technically not the operative pleading unless and until Bianchi
properly files it.  However, the court refers to Bianchi's proposed amended
complaint as the amended complaint throughout this Memorandum-
Decision and Order for the sake of ease.

[3] The facts are drawn from Bianchi's amended complaint and
presented in the light most favorable to her.

years, and, at all times relevant, was serving as Special Counsel at the

Division of Criminal Justice Services (DCJS). (Am. Compl. at 1, ¶¶ 2-3.) In

or around June 2017, OIG began investigating allegations of systemic

sexual harassment, age discrimination, racism, and workplace violence in

the Office of Forensic Services (OFS) within DCJS. (*Id.* ¶ 22.) As part of

the investigation, "numerous" DCJS employees provided sworn testimony

to OIG investigators. (*Id.* ¶ 23.) On or about August 3, 2017, Bianchi

provided sworn testimony in connection with OIG's investigation into

allegations that Brian Gestring, Director of Forensic Services for DCJS, had

engaged in continuing acts of sexual harassment, age discrimination,

racism, and workplace violence over a five-year period. (*Id.* ¶ 28.)

Bianchi's testimony included the following.[4] Initially, Bianchi was

Gestring's supervisor. (Dkt. No. 28, Attach. 4 at 9.) When Gestring "had

made a couple of inappropriate comments," including "one that . . . had to

do with . . . a pubic hair," which was "completely inappropriate," Bianchi

and Green, the Commissioner of DCJS and her supervisor, (Am. Compl.

---

[4] For the reasons argued by Davis, (Dkt. No. 28, Attach. 5 at 1-2), the court agrees that it is proper to consider the transcript of Bianchi's testimony in deciding defendants' motions to dismiss, as it is incorporated by reference in the amended complaint.

4

¶¶ 9-10), counseled Gestring over the incident, (Dkt. No. 28, Attach. 4 at 11). When Bianchi was no longer Gestring's supervisor, and other DCJS employees came to her regarding "issues" with Gestring, Bianchi told them to go to Human Resources because "[i]t was becoming controversial" and Green told her "please don't get involved." (*Id.* at 15.) "So, they did go to HR and apparently got no resol[ution]." (*Id.*)

Bianchi also testified to the following. A female DCJS employee told her that Gestring said, in front of Davis, Deputy Commissioner and Director of Human Resources for DCJS, (Am. Compl. ¶ 16), "if you say something like that again, I'll throw you out the window and . . . [Davis] just sort of laughed." (Dkt. No. 28, Attach. 4 at 16, 33.) When asked about Davis and how she would react to a complaint, Bianchi testified, "I guess it depends on who she likes." (*Id.* at 34, 36-37.)[5] Bianchi also heard that Gestring "had some issue with" another female employee, (*id.* at 16), and thought "some of the things . . . [Gestring] said [were] inappropriate sexual type comments," (*id.* at 18-19, 33).[6] Bianchi also described how a female

---

[5] Bianchi also testified that her secretary, who is black, filed a racial complaint against Davis. (Dkt. No. 28, Attach. 4 at 37.)

[6] Although not contained in her testimony, in her complaint Bianchi alleges that she "received numerous complaints about Gestring,

employee told her Gestring was "constantly talking about leaks and if [he] f[ou]nd out who the leaker [wa]s" they would be fired; "it was sort of a lot of threats like that." (*Id.* at 20.) Bianchi also testified that Gestring "was retaliatory" and she "d[id]n't see a lot being done with regard to his retaliatory action." (*Id.* at 24.)

Bianchi also testified that it was her "perception" that Gestring played favorites with the younger women in the office, (*id.* at 48-49), and her "own personal feeling" that he is a misogynist, (*id.* at 10).[7] When asked, "Did you ever hear . . . Gestring make comments regarding how he could set somebody up or at NYPD we would put stuff in people's drawers?," Bianchi responded that a female employee had told her Gestring said that. (*Id.* at 60.) Bianchi testified that "[t]here is definitely a culture of fear . . . but [she] was sort of told to, you don't oversee him," "[b]ack off," and "[i]t's not your issue." (*Id.* at 63.)

According to Bianchi's complaint, "Green's continued isolation of

_____

including . . . [his] stating that employees should 'hump' more, and that his subordinates should 'think in the shower.'" (Am. Compl. ¶ 33.)

[7] When asked whether Gestring made seemingly ageist comments regarding women's driver's licenses, Bianchi testified, "I think he may have said something like that to me[.]" (Dkt. No. 28, Attach. 4 at 34-35.)

Gestring from rebuke or discipline allowed for an atmosphere of inequality and intimidation to cultivate in [OFS]." (Am. Compl. ¶ 38.) Gestring was never disciplined for any inappropriate conduct until after OIG's investigation became public in March 2018 and Gestring was terminated, which was almost six years after his inappropriate behavior commenced. (*Id.* ¶¶ 39-40.) Green and DCJS representatives "completely disavowed" that Gestring's termination was related in any way to OIG's investigation, and instead resulted from a single inappropriate comment Gestring made in June 2017, which was reported at the time, but nothing was done. (*Id.* ¶¶ 41-43.)

In late October 2017, Leahy Scott, Inspector General for the State of New York, (*id.* ¶ 12), and the Executive Deputy Inspector General met with Green and Czajka, Deputy Commissioner and Counsel at DCJS, (*id.* ¶ 14), to discuss the findings and recommendations of OIG's investigation, of which Leahy Scott had kept DCJS apprised throughout, (*id.* at ¶ 45). At the meeting, Green and Czajka were advised that the investigation had found that the OFS environment was "'rife'" with incidents of sexual harassment, age discrimination, racism, and threats of retaliation and physical violence that had been permitted to continue for years by DCJS executive

management, including Green, Czajka, and Davis.  (*Id.* at ¶ 46.)  Following

the meeting, in or around November 2017, Leahy Scott, in response to

Green's and Czajka's requests, provided recordings of witnesses'

testimony, including a copy of Bianchi's sworn testimony, to Green and

Czajka.  (*Id.* at ¶ 47.)  Czajka ordered a transcription of Bianchi's taped

testimony.  (*Id.* ¶ 50.)

Bianchi alleges that together, Green and Czajka acted in concert to

retaliate against her for her testimony, which placed them and Davis,

among others, in a negative light.  (*Id.* ¶ 52.)  On December 5, 2017,

Bianchi went to Green's office for a meeting that he requested.  (*Id.* ¶ 54.)

At the meeting, which lasted over two hours and twenty minutes, Green

interrogated Bianchi regarding her testimony to OIG, played back portions

of it, and berated her for it.  (*Id.* ¶¶ 55-57, 62.)  Green "repeatedly stated

that [Bianchi] should have responded to [OIG]'s inquiries with a statement

that was, in sum or substance, 'I do not have a specific fact upon which to

base an answer to your question.'"  (*Id.* ¶ 61.)  Bianchi was told to return in

an hour.  (*Id.* ¶ 63.)  At the second meeting, which Davis had the Deputy

Director of Human Resources participate in, (*id.* ¶ 65), Green advised

Bianchi that "due to her testimony, she was being terminated[8] from her position as Special Counsel, effective immediately," (*id.* ¶ 64). At that time, Green handed Bianchi a letter signed by Davis stating that she was terminated. (*Id.* ¶ 66.)

## B. Procedural History

Bianchi filed her complaint on May 25, 2018, (Compl., Dkt. No. 1), and later an amended complaint, *see supra* note 2. Her causes of action are: (1) a First Amendment retaliation claim against all defendants, (Am. Compl. ¶¶ 102-18); (2) a retaliation claim pursuant to Article I, Section 8 of the New York State Constitution against all defendants, (*id.* ¶¶ 119-25); (3) a First Amendment claim for refusal to commit perjury against Green, Czajka, Davis, and Does, (*id.* ¶¶ 126-32); (4) a New York State Human Rights Law (NYSHRL) retaliation claim against Green and Davis, (*id.* ¶¶ 133-42); (5) a NYSHRL aiding and abetting retaliation claim against

---

[8] Bianchi "was advised that she could return to her 'hold' position as a Staff Attorney." (Am. Compl. ¶ 77.) Although it is referred to at least once by a defendant as a demotion, (Dkt. No. 32, Attach. 5 at 3), no defendant disputes that it was legally an adverse action. The court uses the term "termination" because it is the term used by Bianchi.

Czajka, Davis, Leahy Scott, and Does, (*id.* ¶¶ 143-48); and (6)[9] a

Fourteenth Amendment claim against all defendants, (¶¶ 149-55).

### III.  Standard of Review

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled

and will not be repeated here.  For a full discussion of the standard, the

court refers the parties to its prior decision in Ellis v. Cohen & Slamowitz,

LLP, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

### IV.  Discussion

**A.     Green**

*1.     First Amendment Retaliation*

"To state a First Amendment retaliation claim, a plaintiff must

establish that: (1) h[er] speech or conduct was protected by the First

Amendment; (2) the defendant took an adverse action against h[er]; and

(3) there was a causal connection between this adverse action and the

protected speech."  *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267,

272 (2d Cir. 2011) (internal citations omitted).  Here, Green challenges only

the first element.  (Dkt. No. 36, Attach. 4 at 4-8.)  Whether an employee's

---

[9] Bianchi's amended complaint labels this the "fifth cause of action," but the court assumes this is an inadvertent error.  (*Compare* Am. Compl. at 27, *with id.* at 28.)

speech is protected by the First Amendment requires two inquiries: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (internal quotation marks and citation omitted).

Here, the subject of Bianchi's sworn testimony to the OIG was a matter of public concern. The court agrees with Green that Bianchi's testimony, standing alone, may not give rise to actionable claims of discrimination. (Dkt. No. 36, Attach. 4 at 6.) However, that argument misses the point. Bianchi's amended complaint alleges that OIG was investigating allegations of sexual harassment, age discrimination, racism, and workplace violence, (Am. Compl. ¶ 28), and the investigation found that OFS was "'rife'" with incidents of the same, (*id.* ¶ 46). And her testimony, although exaggerated in respects by her amended complaint, nonetheless concerned discrimination problems generally and was not limited to instances affecting only her. *See Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006). Bianchi's testimony concerned pervasive misconduct by public officials and was part of an overall effort to correct allegedly unlawful practices. *Cf. Saulpaugh v.*

*Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993). This is not a case where the speech is unprotected because it concerned only Bianchi's personal situation and did not hint at broader problems; indeed, it is the opposite. *Cf. Pedrosa v. City of New York*, No. 13 Civ. 1890, 2014 WL 99997, at *12 (S.D.N.Y. Jan. 9, 2014). That is, Bianchi's testimony and the circumstances around it suggest that she attempted to shed light on public employee discrimination and misconduct more generally. *Cf. Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 291 (2d Cir. 2013). Moreover, Green's argument that Bianchi's testimony was not public in nature, (Dkt. No. 36, Attach. 4 at 7-8), is not determinative. *See Jackler*, 658 F.3d at 235 ("The fact that a statement was made . . . in private is not determinative of whether its subject was a matter of public concern.") (internal citations omitted).

Bianchi was also speaking as a citizen, rather than solely as an employee. *Id.* "Truthful testimony under oath by a public employee outside the scope of h[er] ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to h[er] public employment or concerns information learned during that employment." *Lane v. Franks*, 573 U.S. 228, 238 (2014); *see Weintraub v.*

12

*Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 204 (2d Cir.

2010) ("[T]he right to complain . . . to an independent state agency is

guaranteed to any citizen in a democratic society regardless of h[er] status

as a public employee.") (internal quotation marks and citation omitted).

Nonetheless, Green argues that Bianchi's testimony was given

pursuant to her official duties and, therefore, she was speaking as an

employee and not entitled to First Amendment protection.  (Dkt. No. 36,

Attach. 4 at 8-10.)  Green quotes from N.Y. Exec. Law § 55(a), which

states that "[e]very state . . . employee . . . shall report promptly to the state

inspector general any information concerning corruption, fraud, criminal

activity, conflicts of interest or abuse by another state officer or employee

relating to his or her office or employment."  (*Id.* at 8-9.)  But Green and the

other defendants who argue the same fail to demonstrate that Bianchi had

any information concerning corruption, fraud, criminal activity, or conflicts of

interest or abuse.  (*See, e.g.*, Dkt. No. 28, Attach. 4 at 53-54 (Bianchi

testifying she has no knowledge Gestring's potential abuse of state

travel).)[10]  Moreover, the court notes Bianchi's allegations regarding her

_____

[10] Czajka's assertion that information concerning sexual harassment,
age discrimination, racism, or workplace violence is covered by N.Y. Exec.
Law § 55(a) is conclusory.  (Dkt. No. 32, Attach. 5 at 18.)

DCJS's Employee Manual; that manual does not mention reporting discrimination or harassment to OIG. (Dkt. No. 60, Attach. 4 at 15 (Am. Compl. citing ¶¶ 113-14).)

Additional arguments by other of the defendants are applicable to this analysis. Davis argues that OIG told Bianchi that they were interviewing her pursuant to Article 4-A of N.Y. Exec. Law, (*id.* at 17 (citing Dkt. No. 28, Attach. 4 at 2)), but OIG did not mention § 55(a), and its statement does not indicate it was invoking that section. It is true, as Davis argues, (Dkt. No. 28, Attach. 5 at 17), that some of OIG's questions related to Bianchi's employment. But this ignores the clear statement in *Lane* that testimony is being given as a citizen "even when the testimony relates to [one's] public employment or concerns information learned during that employment." 573 U.S. at 238. Czajka also argues that Bianchi testified during work hours, on a work day, on state time. (Dkt. No. 32, Attach. 5 at 18.) But, as Bianchi argues, (Dkt. No. 60, Attach. 4 at 13), OIG made it clear that her "interview [wa]s voluntary" and "[she was] not being compelled to speak to the state inspector general" and thanked her for coming in and taking her

time.  (Dkt. No. 28, Attach. 4 at 2-3, 74.)[11]

Green's last argument regarding Bianchi's First Amendment retaliation claim is that he is entitled to qualified immunity.  (Dkt. No. 36, Attach. 4 at 10-11.)  But aside from a boilerplate explanation as to the doctrine, Green adds only that "[e]xisting case law demonstrates that the state employee was not speaking in their capacity as a citizen when speaking with . . . OIG."  (*Id.* at 10-11.)  This is far from sufficient to demonstrate that Green is entitled to qualified immunity.

In sum, Bianchi's First Amendment retaliation claim against Green survives.

### 2. *Article I, Section 8 Retaliation*

Although not argued by Green, the court agrees with Davis that Bianchi's retaliation claim pursuant to Article I, Section 8 of the New York State Constitution is duplicative of her § 1983 First Amendment retaliation claim.  (Dkt. No. 28, Attach. 5 at 23); *Leibovitz v. City of New York*, 14-CV-7106, 2018 WL 1157872, at *21 (E.D.N.Y. Mar. 2, 2018) ("[V]arious federal courts in this circuit have held that there is no private right of action

---

[11] This also clearly rebuts Green's argument that Bianchi "had an obligation to speak with [OIG] in cooperation with their investigation." (Dkt. No. 36, Attach. 4 at 9.)

under the New York State Constitution where . . . remedies are available under [§] 1983.") (internal quotation marks and citations omitted); *cf. Sanders v. City of New York*, No. 12 CV 2906, 2015 WL 2331105, at *9 (S.D.N.Y. May 11, 2015).  Bianchi's only response on this point is that Article I, Section 8 claims are governed by the same principles and subject to the same analysis as her § 1983 First Amendment claim, (Dkt. No. 60, Attach. 4 at 16 & n.10), which does not rebut Davis' argument.  Thus, Bianchi's second cause of action is dismissed as to all defendants.

### 3. *First Amendment Refusal to Commit Perjury*

The court agrees with Green that Bianchi has not properly pleaded a claim for refusal to commit perjury because there is no allegation that anyone asked her to perjure herself or recant a statement, (Dkt. No. 36, Attach. 4 at 11), and Czajka makes the point as well, (Dkt. No. 32, Attach. 5 at 20-21), Bianchi's attempt to counter this argument is an unconvincing grasp at straws.  (Dkt. No. 59, Attach. 4 at 14-16; Dkt. No. 61, Attach. 4 19-21.)  Thus, Bianchi's third cause of action is dismissed against Green, Czajka, Davis, and Does.

### 4. *NYSHRL Retaliation*

Green argues that Bianchi failed to cite the underlying section of the

NYSHRL allegedly violated, (Dkt. No. 35, Attach. 6 at 12), but Bianchi cites N.Y. Exec. Law § 296(1)(e), which states that it is unlawful "[f]or any employer . . . to discharge . . . or otherwise discriminate against any person because . . . she has . . . testified or assisted in any proceeding under this article," (Am. Compl. ¶ 139). Green also argues that he cannot be liable because an individual cannot be an "employer" under the NYSHRL. (Dkt. No. 35, Attach. 6 at 12.) However, the court agrees with Bianchi that an individual can be an "employer," (Dkt. No. 59, Attach. 4), because the case law says as much. *See Popat v. Levy*, 328 F. Supp. 3d 106, 126 (W.D.N.Y. 2018) (holding individual qualifies as NYSHRL "employer" if he or she "has 'any ownership interest or any power to do more than carry out personnel decisions made by others'") (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984)); *Atkinson v. N.Y. State Olympic Reg'l Dev. Auth.*, 822 F. Supp. 2d 182, 194 (N.D.N.Y. 2011) (same); *Maher v. All. Morg. Banking Corp.*, 650 F. Supp. 2d 249, 260 (E.D.N.Y. 2009). As Bianchi alleges that Green was her direct supervisor, (Am. Compl. ¶ 4), removed her as Gestring's supervisor, (*id.* ¶ 35), and terminated her, (*id.* ¶ 64), the court declines to say at this stage that Green was not Bianchi's "employer" under the NYSHRL.

*5.    Fourteenth Amendment*

In the face of Bianchi's Fourteenth Amendment claim, Green argues only, in conclusory fashion, that she "failed to demonstrate . . . that she engaged in a protected activity, that [he] knew about it, and that [he] retaliated against her."  (Dkt. No. 36, Attach. 4 at 15.)  But Green offers no support for this argument, and, in the face of Bianchi's allegations, (*see, e.g.*, Am. Compl. ¶¶ 4, 38, 45-47, 54-56, 59-64), it has no merit.

**B.    Davis**

*1.    First Amendment Retaliation*

Davis' arguments as to First Amendment retaliation, (Dkt. No. 28, Attach. 5 at 12-18), were addressed and rejected above, *see supra* Part.IV.A.1.  On a more general level, though, Davis argues that Bianchi fails to state a plausible claim against her.  (Dkt. No. 28, Attach. 5 at 10-12.)  Davis focuses on the fact that Bianchi's allegation that "Davis was aware that [Bianchi]'s testimony before [OIG] had been provided to . . . Green and Czajka" was made upon information and belief, (*id.* at 10-11 (citing Am. Compl. ¶ 69[12])), and that Bianchi makes no allegations that

_____

[12] Technically, Davis cited Compl. ¶ 65, but in the amended complaint it is ¶ 69.

18

Davis participated in Green's and Czajka's meeting with OIG or was involved in the request of Bianchi's testimony, (Dkt. No. 28, Attach. 5 at 11). Davis also attacks Bianchi's allegations, "upon information and belief," that Davis was aware of Green's intent to fire Bianchi for retaliatory reasons. (*Id.* at 11-12.) Davis argues "the only fact [Bianchi] pleads in support of this allegation is that she received a termination letter signed by Davis." (*Id.*)

Davis' arguments ignore that the court "must accept the facts alleged in the [amended] complaint as true and construe all reasonable inferences in [the plaintiff]'s favor." *Oteze Fowlkes v. Adamec*, 432 F.3d 90, 95 (2d Cir. 2005) (internal citation omitted). Based on the fact that Bianchi's termination letter was signed by Davis, it is reasonable to infer that Davis knew Green's reasoning for her termination. This inference is bolstered by Bianchi's allegations that Davis had the Deputy Director of Human Resources participate in the meeting at which Green was terminated, (Am. Compl. ¶ 65), and that Davis, as DCJS's Deputy Commissioner and Human Resources Director, would have been consulted by Green about the decision to terminate Bianchi, including the basis for that termination, (*id.* ¶ 71). Moreover, Davis' argument that "[Bianchi] did not testify that she

or anyone else reported to . . . Davis that Gestring was subjecting them to workplace violence, age discrimination, racism, or sexual harassment," (Dkt. No. 28, Attach. 5 at 11), does not hold up upon review of Bianchi's testimony. (Dkt. No. 28, Attach. 4 at 16, 33-34, 36-37; Am. Compl. ¶ 46.) Thus, Davis has not demonstrated that Bianchi's First Amendment retaliation claim should be dismissed against her.

     *2.    NYSHRL Retaliation*

     Bianchi claims Davis is liable as an "employer" under the NYSHRL. (Am. Compl. ¶¶ 136, 138.) However, the court agrees with Davis that there is nothing to indicate that she had supervisory powers over Bianchi. (Dkt. No. 28, Attach. 5 at 23); *see Popat*, 328 F. Supp. 3d at 126. And Bianchi's assertion that "Davis, due to her power to do more than carry out personnel decisions made by others . . . is considered an 'employer' under the [NYSHRL]," is conclusory. (Am. Compl. ¶ 136.) Bianchi does allege that Davis signed her termination letter, (*id.* ¶ 66; Dkt. No. 60, Attach. 4 at 20), as Human Resources Director she would have been consulted by Green about the termination, (Am. Compl. ¶ 71), and that, upon information and belief, Davis was among those that "made" the termination decision, (*id.* ¶ 76). But even construing all reasonable inferences in Davis' favor, these

allegations are insufficient to demonstrate that Davis had the power to do more than carry out personnel decisions made by others, *see Popat*, 328 F. Supp. 3d at 126, especially given Bianchi's allegations that Green was her "direct supervisor," (Am. Compl. ¶ 4), and he was the one that advised her of her termination, (*id.* ¶ 64). Therefore, Bianchi's fourth cause of action, (*id.* ¶¶ 133-42), is dismissed as to Davis.

However, with her fifth cause of action, (*id.* ¶¶ 143-48), Bianchi has stated a viable NYSHRL aider and abettor claim against Davis. Davis' only counterargument is that without a claim against an NYSHRL "employer" such that there is a primary violation, there can be no aiding and abetting liability. (Dkt. No. 28, Attach. 5 at 21-22, 23.)[13] However, given that Bianchi has a viable claim against Green as an NYSHRL "employer," *see supra* Part.IV.A.4, this argument fails.

3. *Fourteenth Amendment*

---

[13] To the extent that Davis argues that she did not share the intent or purpose of the "employer" such that she is not liable for aider and abettor liability, (Dkt. No. 72, Attach. 1 at 9, 10-11), that argument is rejected because it was raised for the first time in her reply brief. *See Jackson v. Infitec, Inc.*, 5:15-cv-894, 2018 WL 679474, at *3 n.8 (N.D.N.Y. Feb. 1, 2018).

The only arguments against Bianchi's Fourteenth Amendment claim in Davis' motion concern procedural and substantive due process. (Dkt. No. 28, Attach. 5 at 24-25.) However, Bianchi's Fourteenth Amendment claim is for retaliation pursuant to the Equal Protection Clause. (Dkt. No. 60, Attach. 4 at 20-21.) Davis makes arguments concerning such a claim but only in her reply brief, (Dkt. No. 72, Attach. 1 at 12-13), and thus Bianchi has not had an opportunity to respond to them. Thus, the court will not consider them at this time. *See Jackson v. Infitec, Inc.*, 5:15-cv-894, 2018 WL 679474, at *3 n.8 (N.D.N.Y. Feb. 1, 2018).[14]

## C. Czajka

### 1. *First Amendment Retaliation*

Czajka's arguments regarding First Amendment retaliation, (Dkt. No. 32, Attach. 5 at 14-18), were addressed above, *see supra* Part.IV.A.1. However, more generally he argues that Bianchi fails to sufficiently plead his involvement. (Dkt. No. 32, Attach. 5 at 12-14.) Czajka argues that, outside of "vague allegations," Bianchi fails to allege anything that would allow a plausible inference that he was involved in her termination. (*Id.* at

---

[14] Moreover, in any event, Davis' main argument that she was not personally involved, (Dkt. No. 72, Attach. 1 at 13), is one that was rejected above, *see supra* Part.IV.B.1.

13.) He focuses on the lack of allegations that he had supervisory authority over her, discussed her OIG testimony with her, or was present at her termination meeting, as well as the fact that Bianchi did not mention him by name in her testimony. (*Id.* at 13-14.) Bianchi counters that she has sufficiently alleged Czajka's involvement. (Dkt. No. 61, Attach. 4 at 7-8.)

Although a close call, at the motion to dismiss stage, the court agrees that Czajka's involvement can be reasonably inferred. *See Oteze Fowlkes*, 432 F.3d at 95. Bianchi alleges that Czajka was part of "DCJS executive management," (Am. Compl. ¶ 44), and upon information and belief that Gestring's conduct was previously reported to and known by him, (*id.* ¶ 30). This is supported by the fact that Czajka is Deputy Commissioner and Counsel. (*Id.* ¶ 14.) Morever, along with Green, Czajka attended the meeting with Leahy Scott and the Executive Deputy Inspector General, in which Czajka was advised "that the OFS environment was 'rife' with incidents of sexual harassment, age discrimination, racism, and threats of retaliation and physical violence which had been permitted to continue for years by DCJS executive management"—executive management that included Czajka, (*id.* ¶¶ 44-46). After the meeting, Green and Czajka requested a recording of Bianchi's testimony, (*id.* ¶ 47), and Czajka alone

ordered the transcription of the recording, (*id.* ¶ 50).  And, along with

Green, Czajka received the final report from Leahy Scott.  (*Id.* ¶ 81.)

Therefore, despite the conclusory nature of Bianchi's allegations that

Czajka "acted in concert" with Green to retaliate against her, (*id.* ¶ 52), and

was among those who "made" the decision to terminate her, (*id.* ¶ 76), at

this stage those are reasonable inferences.  Discovery and a summary

judgment motion may prove otherwise, but, for now, Czajka has not

demonstrated entitlement to dismissal.  *See Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (holding at motion to dismiss stage claim has facial

plausibility where factual content allows court to draw reasonable inference

that defendant is liable for misconduct).

Czajka also argues that he is entitled to qualified immunity as to

Bianchi's First Amendment retaliation claim.  (Dkt. No. 32, Attach. 5 at 18-

19.)  However, like Green's qualified immunity argument, Czajka merely

pays lip service to the doctrine.  His conclusory assertions and boilerplate

language do not entitle him to qualified immunity.

    *2.    NYSHRL Aiding and Abetting*

For the reasons just discussed, *see supra* Part.IV.C.1, Czajka's

argument that Bianchi has not set forth a cognizable NYSHRL aiding and

abetting claim fails.  (Dkt. No. 32, Attach. 5 at 22.)  Czajka also argues that the claim fails because there is no underlying NYSHRL claim of discrimination or retaliation.  (*Id.* at 22-24.)  But Bianchi has stated a viable NYSHRL claim against Green as her employer, *see supra* Part.IV.A.4, and therefore a potentially-viable aiding and abetting claim against Czajka. (Dkt. No. 61, Attach. 4 at 7-8.)

> *3.    Fourteenth Amendment*

In addressing Bianchi's Fourteenth Amendment claim, Czajka merely repeats his other arguments, (Dkt. No. 32, Attach. 5 at 25), which were rejected above.

**D.    Leahy Scott**

Leahy Scott argues that "the mere fact that [she] provided [Bianchi]'s testimony to DCJS does not render [her] liable for the subsequent actions taken by DCJS."  (Dkt. No. 30, Attach. 1 at 2.)  The court agrees.

Bianchi alleges that, in response to Green and Czajka's requests, Leahy Scott provided recordings of witnesses' testimony, including a copy of her testimony, to Green and Czajka, (Am. Compl. ¶ 47), and that this was unauthorized, (*id.* at ¶ 48).  But, as the state Inspector General, Leahy Scott is statutorily required to "inform the heads of covered agencies of

[relevant] allegations and the progress of investigations related thereto, unless special circumstances require confidentiality."  N.Y. Exec. Law. § 53(2).  Even if, as Bianchi argues, the law does not explicitly authorize Leahy Scott's action here, (Dkt. No. 58, Attach. 4 at 4-5), Bianchi fails to cite a statute, regulation, or any other authority for her claim that her testimony was impermissibly provided to Green and Czajka, (Dkt. No. 30, Attach. 1 at 6).[15]

Bianchi also alleges that Leahy Scott "apparently" did not turn over tapes of two complaining witnesses in the investigation because they were fearful of retaliation, (Am. Compl. ¶ 51), but she makes no allegation that she was fearful of retaliation or that special circumstances requiring confidentiality existed, (*see generally* Am. Compl.).  And, although Bianchi implies that she "understood" that her sworn testimony would be confidential, (*id.* ¶ 24), she was not told that and, in fact, was told that it was being recorded, (Dkt. No. 28, Attach. 4 at 2).

Perhaps most importantly, Bianchi alleges that "Leahy Scott's

---

[15] Bianchi does allege that "it is not the standard or routine practice" of OIG to release tapes or transcripts of state employees' testimony to their supervisors, coworkers, or agency heads, but that allegation is made upon information and belief, and it ignores N.Y. Exec. Law. § 53(2).  (Am. Compl. ¶ 27.)

unusual act of providing . . . Green and Czajka with [her] sworn testimony *had to be with the knowledge and understanding that said testimony could be and would be used against [Bianchi] by . . . Green and Czajka*." (Am. Compl. ¶ 83 (emphasis added).) This is bald speculation. *See Idlisan v. N.Y.C. Health & Hosps. Corp.*, No. 12 Civ. 9163, 2013 WL 6049076, at *5 (S.D.N.Y. Nov. 15, 2013). Even assuming Leahy Scott exercised poor judgment in fulfilling the request for Bianchi's testimony—which the court is not convinced of—Bianchi offers no reason to believe that Leahy Scott *had* to have known and understood Green and Czajka would use it against Bianchi. The court must afford Bianchi reasonable inferences, but that is a bridge too far.[16] Likewise, Bianchi's allegation that Leahy Scott "is an active participant in the continued retaliation against [her]," (Am. Compl. ¶ 94), is speculative and conclusory. To wit, Bianchi's arguments that somehow Leahy Scott is liable for statements by her representatives well after Bianchi's termination are confusing and ring hollow. (Dkt. No. 58, Attach. 4 at 8-9.)

---

[16] In any event, the court sees no reason to infer that Leahy Scott would have a motive to retaliate against Bianchi; it seems just as likely, if not more so, that Leahy Scott would be pleased with Bianchi for assisting OIG's investigation.

Accordingly, the court agrees with Leahy Scott that Bianchi's First Amendment retaliation claim fails against her because of lack of personal involvement or an adverse employment action. (Dkt. No. 30, Attach. 1 at 7-11.) The court also agrees that she is not liable under the NYSHRL, (*id.* at 12-14), or the Fourteenth Amendment, (*id.* at 11-12). Finally, the court also holds that Leahy Scott is entitled to qualified immunity for the reasons that she argues, (*id.* at 15-17).

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Green's motion to dismiss (Dkt. No. 36) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

       **GRANTED** as to Bianchi's second (Am. Compl. ¶¶ 119-25) and third (Am. Compl. ¶¶ 126-32) causes of action against him; and

       **DENIED** in all other respects; and it is further

**ORDERED** that Davis' motion to dismiss (Dkt. No. 28) is **GRANTED IN PART** and **DENIED IN PART** as follows:

       **GRANTED** as to Bianchi's second (Am. Compl. ¶¶ 119-25), third (Am. Compl. ¶¶ 126-32), and fourth (Am. Compl. ¶¶ 133-42) causes of action against her; and

**DENIED** in all other respects; and it is further

**ORDERED** that Czajka's motion to dismiss (Dkt. No. 32) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** as to Bianchi's second (Am. Compl. ¶¶ 119-25) and
>
> third (Am. Compl. ¶¶ 126-32) causes of action against him; and
>
> **DENIED** in all other respects; and it is further

**ORDERED** that Leahy Scott's motion to dismiss (Dkt. No. 30) is

**GRANTED**; and it is further

**ORDERED** that the Clerk terminate Leahy Scott from this action; and

it is further

**ORDERED** that Bianchi's cross-motions to amend her complaint

(Dkt. Nos. 58-61) are **GRANTED**, and she is directed to file her proposed

amended complaint (Dkt. No. 58, Attach. 3) with no additions or changes

other than to delete the cause of actions hereby dismissed by this

Memorandum-Decision and Order; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Daniel J.

Stewart to schedule further proceedings in accordance with this

Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

March 29, 2019
Albany, New York

Gary L. Sharpe
U.S. District Judge