**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GINA L. BIANCHI,**

                         **Plaintiff,**

        **v.**

**MICHAEL C. GREEN et al.,**

                      **Defendants.**

**1:18-cv-619**
**(GLS/DJS)**

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Bailey, Johnson & Peck, P.C. | JOHN W. BAILEY, ESQ. |
| 5 Pine West Plaza, Suite 507 | CRYSTAL R. PECK, ESQ. |
| Washington Avenue Extension | |
| Albany, NY 12205 | |
| | |
| **FOR THE DEFENDANTS:** | |
| _Michael C. Green_ | |
| Girvin & Ferlazzo, P.C. | PATRICK J. FITZGERALD, III, |
| 20 Corporate Woods Boulevard | ESQ. |
| Albany, NY 12211-2350 | SCOTT P. QUESNEL, ESQ. |
| | |
| _John Czajka_ | |
| Nixon, Peabody Law Firm | TINA E. SCIOCCHETTI, ESQ. |
| 677 Broadway | ANDREW C. ROSE, ESQ. |
| 10th Floor | ERIN HUNTINGTON, ESQ. |
| Albany, NY 12207 | |
| | |
| 1300 Clinton Square | TODD R. SHINAMAN, ESQ. |
| Rochester, NY 14604-1792 | |
| | |
| _John Doe #1-4; Jane Roe #1-4_ | |
| | NO APPEARANCE |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Gina L. Bianchi brought this action against Michael C. Green,

John Czajka, and several John Doe and Jane Roe defendants pursuant to

42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments

and for violations of the New York State Human Rights Law (NYSHRL).

(Am. Compl., Dkt. No. 76 at 1-2.[1])  Green and Czajka have each moved for

summary judgment on all claims against them.  (Dkt. Nos. 188, 191.)  For

the reasons that follow, Czajka's motion is granted, Green's motion is

granted in part and denied in part, and the John Doe and Jane Roe[2]

defendants are dismissed.

---

[1]  Citations are to the pagination generated by CM/ECF, the Court's electronic
filing system.

[2]  The John Doe and Jane Roe defendants have yet to be identified by Bianchi, and, thus, are hereby dismissed from the action. *See Sachs v. Cantwell*, No. 10 Civ. 1663, 2012 WL 3822220, at *10 (S.D.N.Y. Sept. 4, 2012) ("The Court dismisses John Doe [defendants] from the case without prejudice for failure to prosecute, as [p]laintiff did not identify the John Doe [d]efendants by the end of discovery.").

## II. __Background__

### A. __Facts__[3]

Bianchi has been employed by New York State for over twenty-seven years, and, at all times relevant, was serving as Special Counsel at the Division of Criminal Justice Services (DCJS). (Green's Statement of Material Facts (SMF) ¶¶ 6, 16, Dkt. No. 188, Attach. 26; Czajka's SMF ¶ 1, Dkt. No. 191, Attach. 21.) As Special Counsel, Bianchi reported directly to Green, Executive Deputy Commissioner for DCJS and was required to work closely with Green as an advisor in various DCJS matters. (Pl.'s Counter SMF ¶ 6, 17 , Dkt. No. 195, Attach. 33.) At all times relevant, Czajka was the Deputy Commissioner and Counsel for DCJS. (Green's SMF ¶ 14.)

In 2012, Brian Gestring was hired to serve as Director of the Office of Forensic Services (OFS), a division within DCJS for which Green was

_____

[3]    Unless otherwise noted, the facts are not in dispute.

3

responsible overseeing.  (*Id*. ¶¶ 4, 10.)  At some point after Gestring was hired, "a concern" was raised regarding offensive statements Gestring made in the workplace.  (*Id.* ¶ 11.)  The concern was investigated and Gestring was issued two letters of counsel regarding his statements.  (*Id.* ¶ 12.)  Both letters of counsel were signed by Bianchi and Green.  (*Id*.    ¶ 13.)

In May 2017, an issue with a DNA record created by an OFS employee was raised with DCJS and DCJS self-reported the issue to the New York State Office of the Inspector General (OIG).  (*Id*. ¶¶ 19-21.)  OIG began investigating the DNA record issue and, at one point, expanded their investigation to look at matters in OFS beyond that issue, which included Gesting's behavior in the workplace.  (*Id.* ¶¶ 22-23.)  On or about July or August 2017, Bianchi was asked to participate in an interview with OIG as a part of their investigation and Bianchi advised Green that she was going to participate in the interview.  (*Id*. ¶¶ 25-26.)  Bianchi met with two OIG investigators on August 3, 2017, who informed her that her testimony was not compelled.  (*Id.* ¶ 27.)  Bianchi's recorded testimony lasted one hour and fifteen minutes, although Bianchi asserts that she also engaged in off-the-record discussions before and after the recording.  (*Id.* ¶

4

30; Pl.'s Counter SMF ¶ 30.)  Bianchi was not the only DCJS employee,

including past and current employees, interviewed in conjunction with the

OIG investigation.  (Green's SMF ¶ 38.)

During her testimony, Bianchi was asked about her working

relationship with Gestring and any knowledge she had regarding

allegations against him.  (Pl.'s Counter SMF ¶¶ 10-11, 14.)  Bianchi

testified that when Gestring was hired in 2012 she was his supervisor but

felt that Gestring "ha[d] a problem reporting to women," and had made

"inappropriate" comments about pubic hair.  (Dkt. No. 195, Attach. 18 at

10:6-11:23.)  Bianchi testified that, eventually, Gestring was placed under

the supervision of another male employee to avoid further issues.  (*Id*.

21:23-22:8.)  Bianchi also testified that she had heard from two other

female employees within DCJS that had made complaints against Gestring

for inappropriate comments and threats, and that management and human

resources ignored these complaints.  (*Id.* at 15:25-16:18.)  Additionally,

Bianchi stated that, in her perception, Gestring preferred to hire younger

female employees while pushing out older female employees.  (*Id.* at

48:22-49:25.)  At a few points throughout her testimony, Bianchi mentioned

that some of the information she was testifying to was heard through "the

rumor mill" at work.  (*Id*. at 17:12, 52:5, 60:7.)

At the conclusion of the investigation, OIG informed Green and Czajka that in addition to investigating the DNA record issue, OIG was concerned about the work atmosphere and the potential risk of litigation within DCJS.  (Green's SMF ¶ 35.)  In response, Green directed Affirmative Action Officer Sandra Van Kampen to conduct an internal investigation into workplace atmosphere.  (*Id.* ¶ 41.)  Green also asked OIG for the recordings of their interviews with DCJS employees, and after several requests, including requests made by Czajka, OIG sent Green the interview recordings of some of the DCJS employees, which included Bianchi's testimony.  (*Id.* ¶¶ 39, 45-46, 50.)  Sometime prior to December 5, 2017, Green listened to Bianchi's testimony and was concerned with the way in which Bianchi conducted herself during the interview, including volunteering information she was not directly asked about, sharing information she heard through "the rumor mill," and stating things like "totally off the record" when she knew she was testifying under oath.  (*Id*. ¶¶ 56-59.)  Bianchi disputes this narrative, asserting Green was only concerned with her testimony because it painted DCJS in a negative light. (Pl.'s SMF ¶ 58.)

On December 5, 2017, Green held a meeting with Bianchi to review her testimony.  (*Id*. ¶ 56.)  Prior to his meeting with Bianchi, Green directed Czajka to review the testimony and point out areas of litigation concern for DCJS.  (Czajka's SMF ¶ 51.)  Bianchi disputes the purpose of Czajka's review of her testimony, asserting its purpose was to criticize her.  (Pl.'s Response to Czajka's SMF, Dkt. 195, Attach. 34 ¶ 51.)  Additionally, prior to Green's meeting with Bianchi and at Green's direction, Czajka contacted the Office of the Governor of the State of New York to inquire about any legal concerns if DCJS removed Bianchi as Special Counsel.  (*Id.* ¶ 48.)  During the December 5 meeting, Green questioned Bianchi about her testimony, including the factual basis for certain statements and the speculative nature of her testimony.  (*Id.* ¶¶ 56-63.)  Green also inquired why Bianchi had not reported certain serious issues to which she testified to, directly to him or other management.  (Green's SMF ¶¶ 68-71, 83.[4])  While Green contends that Bianchi admitted that some of her testimony did not have a factual basis or that statements she gave were based on

_____

[4]  Bianchi asserts that, in the December 5 meeting, she told Green that she had previously reported these issues and that Green instructed her to not get involved.  (Pl.'s Response to Czajka's SMF, Dkt. No. 195, Attach. 34 ¶ 56.)

speculation, (*id.* ¶¶ 88-90),  Bianchi disputes this characterization of the meeting, asserting that she explained that she had advised OIG when she was speculating or did not have firsthand knowledge.  (Pl.'s Response to Green's SMF, Dkt. No. 195, Attach 35    ¶¶ 88-90.)  Approximately forty-five minutes after the December 5 meeting, Bianchi met with Green a second time wherein Green advised her that she was being demoted from the position of Special Counsel.  (*Id.*, Attach. 33 ¶ 68.)

**B.   Procedural History**

Bianchi filed her original complaint on May 25, 2018, (Compl., Dkt. No. 1), and Green, Czajka, and two other named defendants moved to dismiss, (Dkt. Nos. 28, 30, 32, 36).  Bianchi then cross-moved to amend her complaint.  (Dkt. No. 58.)  In March 2019, this court granted Green and Czajka's motions to dismiss in part and denied in part and granted Bianchi's motion to amend her complaint.  (Dkt. No. 75.)  The claims against the other named defendants were dismissed.  (*Id.*; Dkt. No. 185.)

### III.  Standard of Review

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F.

Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV.  Discussion

### A.    First Amendment Retaliation

Green and Czakja both argue that Bianchi's speech was not protected because she was speaking on matters regarding her personal situation and grievances, and because she was required to testify to OIG pursuant to New York Executive Law, and, therefore, was speaking pursuant to her official job duties.  (Dkt. No. 188, Attach. 25 at 12-17; Dkt. No. 191, Attach. 20 at 12-15.)  Alternatively, Green and Czajka contend that, even if Bianchi's speech was protected, her removal from her position of Special Counsel was not due to a retaliatory motive but rather to the nature in which she conducted herself during the interview with OIG, the potential disruption her speech could have caused within DCJS, and the fact that she testified not reporting information she was required to report. (Dkt. No. 188, Attach. 25 at 17-22; Dkt. No. 191, Attach. 20 at 15-17.) Czajka further argues that Bianchi's First Amendment claim against him should be dismissed because he was not personally involved in the

adverse action against Bianchi nor did he hold any retaliatory animus. (Dkt. No. 191, Attach. 20 at 7-11.)

Bianchi counters that her testimony was not required pursuant to New York Executive Law because she was not reporting information concerning "corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment," nor did her speech otherwise relate to the performance of her official duties because she no longer supervised or worked directly with Gestring.  (Dkt. No. 195, Attach. 37 at 2-7.)  Additionally, Bianchi argues that her speech was a matter of public concern because she was testifying about complaints of harassment within DCJS from other employees that were never addressed, as well as age and gender discrimination.  (*Id.*) Bianchi further maintains that her removal from the position of Special Counsel was not justified and that any non-retaliatory reasoning proffered by defendants is pretext because the record demonstrates through meeting notes and deposition testimony that the real reason Bianchi was terminated was because her testimony "painted the agency in a negative light." (*Id.* at 8-10.)  Finally, Bianchi argues that Czajka was personally involved in the adverse action against her because he provided that basis

for her termination to Green when Czajka reviewed and took notes on Bianchi's testimony at Green's direction.  (*Id.* at 10-11.)

To survive summary judgment on a First Amendment retaliation claim, a public employee must "bring forth evidence showing that [s]he has engaged in protected First Amendment activity, [s]he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action."  *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (citation omitted).  The standard for assessing whether a public employee's speech was protected speech under the First Amendment involves "two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, and it should consider the content, form, and context of the speech in light of the record as a whole. *See Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.1999) (citing *Connick v.*

11

*Myers*, 461 U.S. 138, 147-48, n.7 (1983)).  Central to this assessment is whether the employee's speech was "calculated to redress personal grievances or whether it had a broader public purpose."  *Lewis*, 165 F.3d at 163-64.  Exposure of governmental misconduct is often considered a matter of considerable concern to the public.  *See Jackler v. Byrne*, 658 F.3d 22, 236 (2d Cir. 2011).  However, speech made pursuant to a public employee's job duties is not protected under the First Amendment, even when speaking on a matter of public concern.  *See Weintraub v. Bd. of Educ. of City School Dist. of City of N.Y.*, 593 F.3d 196, 201-02 (2d Cir. 2010).  Speech made pursuant to a public employee's job duties is "'speech that owes its existence to a public employee's professional responsibilities.'"  See *id*. at 201 (quoting *Garcetti*, 547 U.S. at 421).  The inquiry into whether speech was made pursuant to an employee's official job duties is "a practical one," focused on whether the speech "was part-and-parcel of h[er] concerns about h[er] ability to properly execute h[er] duties."  *Id*. at 202-03 (internal quotation marks and citations omitted).  The Second Circuit has found that where a state employee was required to, under New York State Executive Law      § 55, report for OIG "any information concerning corruption, fraud, criminal activity, conflicts of

interest or abuse by another state officer or employee relating to his or her office or employment," then such speech is not protected because it relates to the state employee's official duties. *D'Olimpio v. Crisafi*, 462 F. App'x. 79, 80 (2d Cir. 2012) (quoting N.Y. Exec. L. § 55(1)).

Summary judgment may still be granted where the plaintiff can make out a prima facie case for retaliation, if the employer can demonstrate that "it would have taken the same adverse action in the absence of the protected speech." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114-15 (2d Cir. 2011) (citation omitted). Additionally, an employer will not be held liable for First Amendment retaliation against a public employee for speech on matters of public concern if the employee's speech was likely to cause a disruption, provided: "(1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *Id*. (quoting *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003); *see Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

Turning first to Czajka's argument regarding personal involvement,

13

there is no evidence that demonstrates Czajka, who did not have authority to hire or fire Bianchi, was personally involved in Bianchi's termination. Czajka's involvement in Bianchi's termination was limited to one e-mail he provided to Green, at Green's direction, after reviewing Bianchi's testimony and taking notes on potential areas from her testimony that posed a threat of litigation, and contacting the Governor's office about any objections they had to terminating Bianchi as Special Counsel.  (Dkt. No. 191, Attach. 21 ¶¶ 33-36.)  There record is devoid of proof that Czajka had any knowledge of a retaliatory motive from anyone in DCJS with authority to terminate. Even if Czajka was aware of a retaliatory motive from Green, that knowledge is insufficient to establish personal involvement.  *See Zdziebloski v. Town of East Greenbush*, 336 F. Supp. 2d 194, 202 (N.D.N.Y. 2004).  Moreso, although Czajka testified to having conversations with Green and Van Kampen regarding Van Kampen's workplace investigation, Czajka's role in Bianchi's termination was limited to providing legal advice to Green, as was his duty as Deputy Commissioner and Counsel for DCJS, which is insufficient to find personal involvement for Section 1983 claims.  *See id*.; *33 Seminary LLC v. City of Binghamton*, 120 F. Supp. 3d 223, 257 (N.D.N.Y. 2015).  Additionally,

Czajka testified that he did not know of Green's final decision to terminate

Bianchi until after it occurred and that his knowledge of Green's December

5 meeting with Bianchi was to determine the basis for which Bianchi made

her statements to OIG and that there was a possibility of termination but no

decision had been made prior to the December 5 meeting.  (Dkt. No. 191,

Attach. 6, at 226:14-19.)  Because he has established a lack of personal

involvement and Bianchi has failed to demonstrate that a triable issue of

fact exists regarding the same, the claim against Czajka must be

dismissed.

Turning next to whether Bianchi's speech was protected, defendants

have not met their burden.  First, Bianchi was testifying to complaints of

harassment that allegedly went ignored by OFS and DCJS management.

Moreover, Bianchi's testimony did not relate to her own personal situation

or personal grievances, in fact, she was testifying about complaints made

by other female employees against Gestring within DCJS and OFS.  While

Bianchi did testify to her experience working with Gestring and her

personal perception that he was a "misogynist," the content, form, and

context of the speech in light of the record as a whole demonstrates that

she was not airing out person grievances but testifying to a pattern of

15

complaints of harassment going unaddressed by state officials.  Ultimately, Bianchi was relaying that she had heard of complaints of harassment within DCJS that were never addressed, which can be considered misconduct by government officials and a matter of considerable concern to the public.  *See Jackler*, 658 F.3d at 236.

While New York State Executive Law § 55(1) mandates state employees to report "any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment," the court is unaware of and the parties have not identified any legal precedent for finding that this section of New York Executive Law covers general employee misconduct.  In fact, courts that have dealt with this issue have been careful to refer to the enumerated categories within the statute, rather than general misconduct. *See D'Olimpio*, 462 F. App'x at 80; *Rusk v. N.Y. State Thruway Auth.*, 37 F. Supp. 3d 578, 584 (W.D.N.Y. 2014).  Moreover, unlike cases where an employee suffers adverse action for reporting misconduct within his or her department to a supervisor, management, or to a union representative, Bianchi was testifying to misconduct within OFS, and DCJS by extension, to an external office that contacted her and informed her that her testimony

16

would be voluntary.  *See Matthews v. City of New York*, 779 F.3d 167, 174

(2d Cir. 2015); *Weintraub*, 593 F.3d at 203; *Cirencione v. County of*

*Ontario*, 21-CV-6615, 2022 WL 2067754, at *6 (W.D.N.Y. Jun. 8, 2022).

Accordingly, defendants have not established their entitlement to summary

judgment with respect to whether Bianchi's speech was protected.

Finally, issues of fact preclude summary judgment with respect to

causation and the rationale for terminating Bianchi as Special Counsel.  Of

note is the fact that OIG concluded in their investigation, which involved

interviewing current and past employees, that there were concerns

regarding the work atmosphere at DCJS and Van Kampen's internal

investigation revealed that two employees had fear of Gestring and

retaliation from him.  (Green's SMF ¶ 38, 41; Dkt. No. 195, Attach 23 at 6,

22, 31.)  Although Van Kampen's investigation concluded that Gestring

was not "creating an atmosphere of fear and intimidation," Bianchi's

testimony is, in part, corroborated by Van Kampen's report about individual

employees' complaints with Gestring.  (Dkt. No. 195, Attach. 23.)  In other

words, there is some support for Gestring's involvement in workplace

climate issues, although not every DCJS or OFS employee had issues with

him.  Green's proffered reasons for demoting Bianchi include, among other

things, that he could no longer trust her after giving testimony under oath

that was not based on personal knowledge and not offering information

unless directly asked.  (Dkt. No. 188, Attach. 26      ¶¶ 94-98.)  Despite

arguments that Bianchi's testimony posed the risk of having a potential

disruption to the daily functions of DCJS, (Dkt. No. 188, Attach. 25 at 17-

23), the fact that there is some corroboration for Bianchi's testimony

regarding complaints made about Gestring, cuts against granting summary

judgment in Green's favor.  *See Jackler*, 658 F.3d at 237 ("[I]f the

allegations of internal misconduct are indeed true, [the employee's]

statements could not have adversely affected the proper functioning of the

department since the statements were made for the very reason that the

department was not functioning properly.") (citation and emphasis omitted).


Additionally, comparing Bianchi's testimony to Van Kampen's notes

from the December 5 meeting highlights some inconsistences within

Green's provided rationale for demoting Bianchi.  Specifically, that Green

took issue with Bianchi not reporting alleged threats made by Gestring,

which occurred after Green told her to stay out of workplace issues

involving Gestring, and shows inconsistencies with Green's reasons for

terminating her because, according to Bianchi, she reported Gestring's threats to Green.  (Dkt. No. 188, Attach. 19 at 3; Dkt. No. 195, Attach. 32 ¶ 63.)  Van Kampen's notes also indicate that Bianchi expressed that she believed she was asked for opinion testimony, which she answered based on personal observations and information relayed to her by other employees, including the two female employees who had filed complaints against Gestring, while, on the other hand, Green characterized many of these statements as  "inaccurate" and "painted a certain picture" of DCJS.  (Dkt. No. 188, Attach. 19 at 4.)  Because Bianchi's testimony is, at least, in part, corroborated by statements made to Van Kampen during her workplace investigation and because there are weaknesses in Green's rationale for terminating Bianchi, a reasonable juror could infer that the explanation provided by Green was pretext for retaliation, and viewing the evidence in the light most favorable to Bianchi, summary judgment is not appropriate.

**B.**   <u>**Equal Protection Retaliation**</u>

Green and Czajka each contend that Bianchi did not complain of or otherwise oppose discrimination in her testimony to OIG.  (Dkt. No. 188, Attach. 25 at 26-33; Dkt. No. 191, Attach. 20 at 18-19.)  Additionally, Green

asserts that Bianchi has failed to demonstrate that any speech she made with respect to discrimination was the but-for cause of her termination as Special Counsel.  (Dkt. No. 188, Attach. 25 at 30-33.) Czajka further argues that, as with Bianchi's claim under the First Amendment, he was not personally involved in the deprivation under the Fourteenth Amendment.  (Dkt. No. 191, Attach. 20 at 18-19.)  Bianchi counters that she was testifying to issues within OFS regarding gender and age discrimination as well as harassment.  (Dkt. No. 195, Attach. 37 at 16-17.) Bianchi also maintains that the temporal proximity of her speech and the adverse action as well as "weaknesses" in Green's explanations for her termination are sufficient to defeat summary judgment.  (*Id*. at 17-19.)

The elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII, as do retaliation claims under New York State Human Rights Law: "(1) defendants acted under the color of state law, (2) defendants took adverse employment action against [the plaintiff], (3) because [s]he complained of or otherwise opposed discrimination."  *See Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 91 (2d Cir. 2015); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir. 1996).  For retaliation under the Fourteenth Amendment, a

plaintiff engages in a protected activity if she "oppose[s] any practice made an unlawful employment practice by Title VII, or make[s] a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation, proceeding, or hearing under Title VII."  *Stoutenger v. City of Fulton*, 605 F. Supp. 3d 432, 459 (N.D.N.Y. 2022) (analyzing a claim for retaliation in violation of the Equal Protection Clause under the same framework as Title VII retaliation claims) (internal quotation marks and citations omitted).  "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks and citation omitted).

Turning first to Czajka's involvement.  For the reasons articulated above, *see supra* Section IV.A, Bianchi's claim against Czajka is entitled to summary judgment.

Next, with respect to Green's argument that Bianchi was not complaining of or opposing discrimination, the court disagrees.  Bianchi's testimony included several instances of Gestring having difficulty reporting to female management, preferring to hire younger, female employees, and making threats to female employees, as well as comments of a sexual

21

nature.  (*See generally* Dkt. No. 195, Attach. 18.)  Moreover, Bianchi had

previously reported some of these incidents but was directed by Green to

"stay out of [it]."  (Pl.'s Counter SMF ¶ 63.)  While Green appears to argue

that her statements do not invoke the Equal Protection Clause, neither

defendant points to any legal authority to indicate that such statements,

after having previously raised the issue to higher management like Green,

do not qualify as complaining of or otherwise opposing age or gender

discrimination.

Turning to the causal relationship between Bianchi's testimony and

the adverse action, the temporal proximity is sufficient to establish a prima

facie case.  Green has offered a non-retaliatory reason for Bianchi's

demotion, however, as discussed above, *see supra* Section IV.A, the

inconsistencies and weaknesses in Green's reasons for doing so create an

issue of fact with respect to whether Green had a retaliatory motive, and,

therefore, summary judgment is precluded.  *See Zann Kwan v. Andalex*

*Grp. LLC*, 737 F.3d 834, at 845 (2d Cir. 2013) ("A plaintiff may prove that

retaliation was a but-for cause of an adverse employment action by

demonstrating weaknesses, implausibilities, inconsistencies, or

contradictions in the employer's proffered legitimate, nonretaliatory reasons

for its action.  From such discrepancies, a reasonable juror could conclude

that the explanations were a pretext for a prohibited reason.").

**C.    New York State Law Claims**

Green and Czajka argue that Bianchi's claims pursuant to N.Y.

Executive Law § 296(1) and (6) must be dismissed against them because

the New York State Court of Appeals determined in *Doe v. Bloomberg*, 36

N.Y.3d 450 (2021), that as individuals, they cannot be held liable as an

employer under New York law.  (Dkt. No. 188, Attach. 25, at 34-35; Dkt.

No. 191, Attach. 20 at 19-20.)  Green and Czajka also contend that they

cannot be held liable for aiding and abetting retaliation under NYSHRL

because Bianchi cannot establish liability on behalf of the

principal/employer because she did not bring suit against DCJS.  (*Id*.)

Bianchi maintains that the holding in *Boomberg* only addressed vicarious

liability of supervisors and has no impact on holding Green and Czajka

liable as individuals.  (Dkt. No. 195, Attach. 37 at 19-24.)  Alternatively,

Bianchi argues that, in the event the court agrees with Green and Czajka

about the holding in *Bloomberg*, the court "should permit [her] [c]omplaint

to be deemed amended" to add a cause of action arising out to N.Y.

Executive Law § 296(7)[5], (*Id*. at 23), a request Green and Czajka oppose

on numerous grounds including prejudice, futility, and failure to comply with

procedural rules.  (Dkt. No. 200, Attach. 7 at 4-5; Dkt. No. 204, Attach. 2 at

11, n.11.)

In *Doe v. Bloomberg*, the Court of Appeals held that individual

employees are not employers within the meaning of NYSHRL and thus

cannot be held liable for retaliation as employers under Executive Law      §

296(1).  However, under the NYSHRL individuals can be liable for "aid[ing],

abet[ting], incit[ing], compel[ling] or coerc[ing] the doing of" a discriminatory

act.  N.Y. Exec. Law § 296(6).  To hold an individual employee liable for

aiding and abetting retaliation under NYSHRL, the employee must have

actually participated in the conduct giving rise to the claim and the

_____

[5]  In her amended complaint, Bianchi alleged a claim for retaliation
pursuant to N.Y. Executive Law § 296(1) which makes it unlawful "[f]or any
employer . . . to discharge . . . any
person because he or she has opposed any practices forbidden under this
article or because he or she has filed a complaint, testified or assisted in
any proceeding."  (Am. Compl., Dkt. No. 76 ¶¶ 120-21.) Alternatively,
Bianchi asserts an aider and abettor claim pursuant to N.Y. Executive Law
§ 296(6).  (*Id*. ¶ 121.)  Bianchi now appears to seek to amend her
complaint for a second time to include claims under N.Y. Executive Law §
296(7), which makes it unlawful "for any person engaged in any activity to
which [Executive Law § 296] applies to retaliate or discriminate against
any person because he or she has opposed any [unlawful] practices. . . or
because he or she has filed a complaint, testified or assisted in any
proceeding."

24

employer's conduct must also be found retaliatory.  *See Farmer v. Shake Shack Enters.*, *LLC*, 473 F. Supp. 3d 309, 337 (S.D.N.Y 2020).  A plaintiff may succeed on a claim under the NYSHRL by showing the employer "encouraged, condoned, or approved the discriminatory conduct of a sole employee—the same discriminatory conduct which then, perhaps 'circular[ly]', proves individual liability under the aiding and abetting provision of Section 296(6)."  *Johnson v. County of Nassau*, 82 F. Supp. 3d. 533, 537 (S.D.N.Y. 2015) (citing *Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97 Civ. 0607, 2001 WL 46986, at *2 (S.D.N.Y. Jan. 18, 2001) (citations omitted), *aff'd*, 31 F. App'x. 746 (2d Cir. 2002). Additionally, where retaliation can be imputed to the employer, an individual employee can be held liable for aiding and abetting under NYSHRL "regardless of whether his actions form the basis for [his employer's] liability in the first instance."  *Boston v. Taconic Mgmt.*, No. 12–CV–4077, 2014 WL 4184751, at *2 n.9 (S.D.N.Y. Aug. 22, 2014).  Courts have found that, under NYSHRL, a sufficient basis for imputing liability on to the employer can be found where a supervisor is involved in the complained of conduct.  *See Accely v. Consol. Edison Co. of N.Y., Inc.*, 19 Civ. 5984, 2022 WL 973415, at *5 (S.D.N.Y. Mar. 31, 2022).

Regarding Bianchi's arguments with respect to the applicability of the Court of Appeal's decision in *Doe v. Bloomberg* to the matter at hand, the court agrees with Green and Czajka's interpretation that they are not employers within the meaning of NYSHRL and thus cannot be held liable for retaliation as employers under Executive Law § 296(1).  However, Bianchi may still have a claim, pursuant to Executive Law § 296(6), for aiding and abetting retaliation against Green and Czajka, which allows for a finding of individual liability for individuals who do not qualify as employers but actually participated in the retaliation.  *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012).  Here, Bianchi did not bring suit against DCJS or New York State and there is a split within the district courts within the Second Circuit about whether an individual can be liable for aiding and abetting when the principal/ employer is either not a party to the suit or immune from suit.  *See Bonaffini v. City Univ. of N.Y.*, 20-cv-5118, 2021 WL 2895688, at *3 (N.D.N.Y. Jul. 9, 2021) (collecting cases). The Second Circuit has not specifically addressed this issue, however, the court is inclined to follow the holding in *Bonaffini*, which held that "dismissal of the cause of action against the principal/employer warrants dismissal of the derivative, aiding and abetting cause of action only where the dismissal

26

against the employer/principal was on the merits." *Bonaffini*, 2021 WL 2895688, at *3 (internal quotation marks, citations, and emphasis omitted); *see Lamere v. N.Y. State Office of the Aging,* No. 03-CV-356, 2005 WL 1174068, at *14-15 (N.D.N.Y. Apr. 27, 2005).

The court ultimately finds that Bianchi's claim under Executive Law § 296(6) against Green survives because the very basis for Bianchi's claims here are Green's alleged retaliatory actions and, although Green cannot be held liable as an employer under NYSHRL § 296(1), he can still individually be held liable for aiding and abetting retaliation. Moreover, for Green, as Bianchi's supervisor and an individual involved in the alleged conduct, liability can be imputed on to DCJS, meaning liability for aiding and abetting retaliation can "circularly" be imputed on to Green. Because Bianchi has clearly adduced evidence that her NYSHRL claim stems from Green's decision to demote her with a retaliatory motive, and because Green was her supervisor and his actions can be imputed to the employer, the claim pursuant to NYSHRL § 296(6)[6] against Green survives summary

---

[6] To the extent that Bianchi seeks to amend her amended complaint to articulate claims pursuant to NYSHRL § 296(7), she has not complied with the Local Rules of Practice with respect to filing a motion to amend, as she has not filed proposed amendments and, therefore, such motion is denied. *See* N.D.N.Y. L.R. 15.1(a),(b).

judgment.  However, Bianchi's claim pursuant to Executive Law § 296(1) must be dismissed, in accordance with Bloomberg, as a matter of law.

Much like Bianchi's claims against him under Section 1983, summary judgment is granted with respect to Bianchi's NYSHRL claims against Czajka because he was not involved with the decision to demote Bianchi beyond giving some legal adive to Green and being appraised of the status of Van Kampen's investigation.  *See Doran v. N.Y. State Dept. of Health Office of Medicaid Inspector Gen.*, 2017 WL 836027, at *13 (S.D.N.Y. Mar. 2, 2017) ("Retaliation claims under the NYSHRL are construed pursuant to the same standards at its federal counterparts, including Title VII and 1983.")

## D.   Qualified Immunity

Green seeks qualified immunity on Bianchi's Section 1983 claims against him because his conduct did not violate clearly established law as of December 2017 because there is no Supreme Court or Second Circuit precedent holding that Green's actions violated the First or Fourteenth Amendments.  (Dkt. No. 188, Attach. 25 at 23-26,33.)  Bianchi maintains that she has established issues of fact that preclude summary judgment on qualified immunity grounds because she has adduced evidence that a

reasonable juror could find that Green had a retaliatory motive which caused Bianchi's termination, which would be a violation of clearly established law against retaliation.  (Dkt. No. 195, Attach. 37 at 11-15.)

Government officials are entitled to qualified immunity on Section 1983 claims "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  A government official defendant is entitled to summary judgment on qualified immunity grounds

> if [he] adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (internal quotation marks and citations omitted).  "Clearly established means that, at the time of the offic[ial]'s conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Wesby*, 138 S. Ct. at 589 (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to Bianchi, there exist

29

questions of fact with respect to Green's motive for terminating her as Special Counsel.  As discussed above, *see supra* Section IV.A; Section IV.B, a reasonable juror could conclude that Green's provided reason for Bianchi's termination was pretext for retaliation and, as such, the court must deny summary judgment to Green[7] on qualified immunity grounds.

**E.    Czajka's Request for Attorney's Fees**

Czajka seeks attorneys fees under 42 U.S.C. § 1998(b) because Bianchi's claims against Czajka were frivolous and she "should have known . . . that Czajka did not take adverse action against her, had no motive to retaliate against her, and acted . . . solely and properly in his role as General Counsel."  (Dkt. No. 195, Attach. 20 at 23-24.)  Bianchi opposes the request for attorneys fees, arguing that Czajka's request for attorneys fees "is designed to intimidate and chill free speech" and her claims against Czajka were not frivolous given the record evidence of his role in requesting her testimony from OIG and commenting on her testimony. (Dkt. No. 195, Attach. 37 at 24-25.)

"In any action or proceeding to enforce a provision of section. . .

─────────────────

[7]  Czajka also argued for summary judgment on qualified immunity grounds, however, because no claims against him survive, the court need not address whether Czajka's conduct in the constitutional violation was objectively unreasonable.

1983. . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).  A plaintiff should not be assessed attorneys fees unless there is "a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even though the action was not brought in subjective bad faith."  *Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n*, 434 U.S. 412, 422 (1978).

Although the court has granted Czajka's motion with respect to all of Bianchi's claims against him because there was a lack of evidence to support his involvement, Bianchi's claim was not frivolous such than an award of attorneys fees would be warranted.  *See Sista v. CDC Ixis North America, Inc*., 445 F.3d 161, 178 (2d Cir. 2006).  Accordingly, the court, in its discretion, denies Czajka's request for attorneys fees.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Czajka's motion for summary judgment (Dkt. No. 191) is **GRANTED**; and it is further

**ORDERED** that Green's motion for summary judgment (Dkt. No. 188) is **GRANTED IN PART** and **DENIED IN PART** as follows:

31

**GRANTED** as to Bianchi's claim under N.Y. Executive Law §

296(1); and

**DENIED** in all other aspects; and it is further

**ORDERED** that the John Doe and Jane Roe defendants are

**DISMISSED** from this case; and it is further

**ORDERED** that defendant John Czajka is **DISMISSED** from this

case; and it is further

**ORDERED** that this case is deemed trial ready and a scheduling

order will be issued in due course; and it is further;

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

August 25, 2023
Albany, New York

Gary L. Sharpe
U.S. District Judge